LIZZIE. M. MAXFIELD *vs.* MAINE CENTRAL RAILROAD CO.

Cumberland. · Opinion March 13, 1905.

*Railroads.   Negligence.   Carriers of Passengers.   Slippery Condition of Station Platform.*

In the actual transportation of passengers, common carriers are required by public policy and safety to exercise the highest degree of care consistent with the business in which they are engaged. They are required to do all that human care, vigilance and foresight can do under the circumstances considering the character and mode of conveyance, to prevent accident to passengers. But the standard recognized by law is that of ordinary care with respect to the exigencies of the particular case; and the "standard by which to determine whether a person has been guilty of negligence is the conduct of a prudent, careful or diligent man."

In view of the great peril involved in the transportation of passengers by steam railways, a very high degree of vigilance, foresight and skill is required to fill the measure of ordinary care in order to prevent accident and injury. So with respect to the duty owed to the passenger on the platform of a railway station, the company is required to exercise ordinary care for the protection and safety of a passenger in that situation but it is obvious that different precautions and safeguards and a less degree of skill and foresight may be sufficient to meet the requirements of ordinary care under those circumstances. The correct principle obviously is that in all

cases the amount of care bestowed must be equal to the emergency, however the standard may be denominated.

It is the duty of a railroad company to exercise all ordinary care to maintain its platform in such a reasonably safe and suitable condition that the passengers who are themselves in the exercise of ordinary care can walk over it in safety.

On motion by defendant. Overruled.

Action on the case for personal injuries sustained by the plaintiff by slipping on the platform at Newhall Station, on the mountain division of the defendant's railroad, as she was walking from the station door for the purpose of taking a train. At the trial in the court of the first instance, the plaintiff recovered a verdict for $1158.35. Thereupon the defendant filed a general motion for a new trial.

The case is fully stated in the opinion.

*Scott Wilson,* and *E. L. Bodge,* for plaintiff.

*Nathan and Henry B. Cleaves and Stephen C. Perry, and Wallace H. White and Seth M. Carter,* for defendant.

SITTING: WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, PEABODY, SPEAR, JJ.

WHITEHOUSE, J. This was an action to recover damages for a personal injury which the plaintiff sustained on the 22nd of December, 1902, by slipping on the platform at Newhall station in the town of Windham, on the mountain division of the defendant's railroad, as she was walking from the station door to the cars for the purpose of taking the morning train to Westbrook. It is alleged in her declaration that this platform had negligently been allowed to remain covered with ice in the line of travel from the door of the station to the cars, and had thereby been rendered slippery and dangerous for passengers having occasion to walk over it for the purpose of entering or leaving the car.

It was not in controversy that on the morning in question, the plaintiff entered the station, purchased a ticket for the eight o'clock train from Newhall to Westbrook, and attempted to walk across the platform for the purpose of entering the car, when she slipped upon the platform and fell, severely spraining her ankle. The jury

rendered a verdict in her favor for $1158.35, and the case comes to this court on the defendant's motion to set the verdict aside as against the evidence.

Upon the question of the defendant's liability, the principal controversy between the parties was one of fact, respecting the precise condition of the platform at the time and place of the accident on the morning of December 22d.

It appears from the testimony of the clerk of the weather bureau at Portland, that a light snow had fallen there in the afternoon of the day before, changing to rain at 3.16 p. m., and that the rain continued to fall more or less during the night, ceasing at 5.20 on the morning of the 22d. It also appears from this record that the temperature at Portland on Sunday the 21st was fifteen degrees below the freezing point in the morning, the average during the day, and when the rain began to fall in the afternoon, being substantially at the freezing point. On Saturday the 20th, it was ten degrees below the freezing point in the morning, the highest during the day being one degree above at two o'clock in the afternoon. It was six below at eight o'clock in the evening. At eight o'clock on the morning of the 22d, at the time of the accident, the temperature at Portland appears to have been eleven degrees above the freezing point.

It is contended, however, that this record of the temperature at Portland is by no means conclusive evidence of the temperature at Newhall, twelve miles farther inland, and even if it were, it is insisted that the temperature above shown is not necessarily inconsistent with the contention that on the platform of the Newhall station at the time of the accident there was in fact a thin coating of ice which had formed during the continued cold weather prevailing during the two preceding days. It is further said that the plaintiff's claim on this point is strengthened by uncontradicted testimony in her behalf, that prior to the freezing weather of Saturday and Sunday, the 20th and 21st, water had been dripping from a defective or obstructed gutter at the edge of the roof projecting over the platform and that the mixture of snow and water, colloquially termed "slush" found on the platform that morning and not wholly removed by the station agent's

shovel, tended to conceal the icy and slippery condition previously created and then existing.

On the other hand, the defendant as earnestly contended that there was no ice whatever on the platform at the time of the accident, that an hour before it happened, the station agent found about half an inch of "slush" there and scraped it off with a large shovel, leaving the platform wet, but with only such "slush" upon it as the shovel failed to reach by reason of the inequalities of the surface. The defendant also claimed that it sufficiently appeared from the plaintiff's own testimony and that of her son that the leaking of the gutter, if any, near the door of the station could not have caused any coating of ice at the edge of the platform where the plaintiff fell.

Upon this issue of fact the testimony was conflicting. The plaintiff's positive testimony that there was a coating of ice upon which she slipped and fell and that no sand or ashes had been sprinkled upon it is emphatically corroborated by her daughter-in-law, who states that she remembers the difficulty with which they picked their way along in passing from the station door to the cars, although they both wore rubbers over their shoes.

Four other witnesses apparently disinterested, give clear and unequivocal testimony that there was a coating of ice on the platform with a little slush or snow and water on top of it; two of them state that it was icy and slippery and that they experienced difficulty in walking safely over it.

In behalf of the defendant, four of its employees, the station agent, conductor, brakeman and carpenter, state postively that while the platform was wet and in some places partially covered with a little slush, there was no ice upon it. One other witness for the defendant testified that there was not a particle of ice on the platform, and two of them testify that they didn't see any ice, but admit that the platform was slippery. There is no claim on the part of the defendant that the precaution of sprinkling sand or ashes on the platform had been exercised by his agents to prevent passengers from slipping upon it in walking from the door of the station to the cars.

Whether this evidence warranted a finding that there had been a breach of duty on the part of the defendant towards its passengers,

was a question which was submitted to the jury under instructions to which no exceptions were taken.

It has been seen that at the time of the accident the plaintiff had purchased her ticket for Westbrook and that the relation of carrier and ·passenger had been fully established between her and the defendant company. *Rogers* v. *Steamboat Co.*, 86 Maine, 261. She was then entitled to the care and protection of its servants. But a great variety of terms have been employed by different courts and law writers to express the nature and extent of the obligation due from carriers to passengers under such circumstances. In the actual transportation of passengers, common carriers are required by public policy and safety to exercise the highest degree of care consistent with the business in which they are engaged. They are required to do all that human care, vigilance and foresight can do under the circumstances considering the character and mode of conveyance, to prevent accident to passengers. *Libby* v. *M. C. Railroad Co.*, 85 Maine, 34. But the standard recognized by law is that of ordinary care with respect to the exigencies of the particular case; and the "standard by which to determine whether a person has been guilty of negligence is the conduct of a prudent, careful or diligent man." Bigelow on Torts, p. 261.

In view of the great peril involved in the transportation of passengers by steam railways, a very high degree of vigilance, foresight and skill is required to fill the measure of ordinary care in order to prevent accident and injury. So with respect to the duty owed to the passenger on the platform of the railway station, the company is required to exercise ordinary care for the protection and safety of a passenger in that situation but it is obvious that different precautions and safeguards and a less degree of skill and foresight may be sufficient to meet the requirements of ordinary care under those circumstances. Many courts, however, have used the same phraseology to describe the duties of the carrier to the passenger whether on the platform or in the cars. In *Knight* v. *Railroad Co.*, 56 Maine, 234, a through passenger sustained an injury on the wharf while passing from the railway station to the steamboat and it was held that the defendant railroad company was "bound to exercise

the same degree of care in making the wharf safe and convenient for passengers to travel over, which is required of common carriers of passengers " and "that common carriers of passengers are required to exercise the strictest care which is consistent with the reasonable performance of their contract of transportation." See also *Tobin* v. *Railway Co.*, 59 Maine, 183.

In *Jordan* v. *N. Y., N. H. & H. Railroad Co.*, 165 Mass. 346, the plaintiff was injured by reason of a defect in the floor of the ladies' toilet room in the station and in the opinion, the court say: "The plaintiff was a passenger and the defendant owed her the highest degree of care consistent with the proper management of the business in which it was engaged."

But the correct principle appears to have been recognized in *Moreland* v. *B. & P. Railroad Co.*, 141 Mass. 31, in which it was held, that a railroad corporation is not bound to exercise the same care towards a passenger who is passing through the station grounds on his way from the train to the highway that it is under obligation to exercise while the passenger is on the train. In the opinion the court say: "The degree of care is not fixed solely by the relation of carriers and passengers; it is measured by the consequences which may follow the want of care. A railroad company is held to the highest degree of care in respect to the condition and management of its engines and cars because negligence in that respect involves extreme peril to passengers against which they cannot protect themselves. It would not act reasonably if it did not exercise greater care in equipping and running its trains, than in regard to the condition of its station grounds."

In 6 Cyc. of Law and Proc., 608, the rule deduced from the decisions is thus stated: "The care required of the carrier for the protection of the passenger on his premises involves reasonable care to provide and maintain safe and adequate station houses, platforms, walks, steps and landings for use in waiting for approaching and leaving trains." In 5 Am. & Eng. Encyc. of Law, 532, the carrier's duty is thus stated: "The rule seems to be that with respect to the stational appointments the carrier is bound to exercise ordinary care in view of the dangers to be apprehended."

This reasonable doctrine was also recognized and expounded in a luminous opinion of this court in the recent case of *Bacon* v. *Steamboat Co.*, 90 Maine, 46. In that case it was held, "that the degree of care which the defendant company was bound to exercise for the protection and safety of its passengers upon a wharf occupied by the company, was that of reasonable diligence or of common care and prudence." In the opinion the court say: "In all cases the amount of care bestowed must be equal to the emergency, however the standard be denominated. We do not mean to say that the distinction between ordinary and gross negligence, or between ordinary and extraordinary care does not still exist, but, in reply, to the suggestion made by the plaintiff's counsel that the same degree of care should be exercised by the defendants when wharfingers or tenants of a wharf used in conjunction with their boats, as is·imposed on them while common carriers of passengers, we do mean to say that we perceive no reason for imposing so extreme an obligation upon the defendants when they have completed their trip and ceased to be longer performing the duties of common carriers; and the authorities do not support any such application of the rule of extraordinary care as is contended for." See also *Caven* v. *Granite Co.*, 99 Maine, 278.

It was the duty then of the defendant company to exercise all ordinary care to maintain the platform in question in such a reasonably safe and suitable condition that passengers who were themselves in the exercise of ordinary care could walk over it in safety. If the plaintiff's contention was correct that at the time and place of the accident, there was a coating of ice on the platform partially covered with slush, it would not be contended that such a condition was a reasonably safe one, for the accommodation of passengers. There was sufficient evidence in behalf of the plaintiff if accepted as true, to support this contention. That evidence was not in itself so unreasonable or improbable or so overborne by undisputed facts that this court would be warranted in rejecting it as incredible. The evidence being conflicting, it was the province of the jury to decide this controverted question of fact. They evidently accepted the plaintiff's version as correct. They drew their conclusion not simply from the words of the witnesses but from their manner and bearing as well, and we do

not feel justified in declaring that their conclusion was manifestly wrong.   The conduct of the plaintiff appears to have been that of reasonably prudent people under like circumstances.   There was no want of ordinary care on her part.

Nor are the damages disproportionate to the injury.   The plaintiff is shown to have had an established business as a canvasser which yielded a net income of $350.00 per year.   At the time of the trial, a year and four months had already elapsed, and she was still unable to walk without crutches.   The testimony of the physician tended to show that six months or a year more would be required to complete the recovery, and a "joint injured to that extent almost never gets as well as new."   For this loss, resulting from her incapacity to resume her vocation, for the expenses of medical attendance and nursing and a reasonable compensation for her suffering, the damages awarded cannot be deemed excessive.

*Motion overruled.*