[No. 6332.]

## THE UNION DEPOT AND RAILWAY COMPANY v. LONDONER.

1. **Railway Companies—Stations—**Among other duties, owing by railway companies to the traveling public, is that of providing safe and convenient stations.—(26)

2. **Union Depot Company—Duties—**A corporation organized for the purpose of maintaining a station or depot to be used by railroad companies, owes to the traveling public, as to the conduct of such station or depot, the same duty as is due from the railway company which maintains its own station; and its obligations toward the public are not affected by the agreement between itself and the railway company.—(26, 27)

3. **——Duty to Those Attending Passenger to the Train—**A corporation maintaining a depot for the accommodation of railway companies, in their passenger traffic, extends to all those desiring to travel by any of the railroads that avail themselves of such depot, an invitation to come thereto, at such station, as well as to those who desire to accompany any such intended passenger, to aid him to the train, or bid him adieu. It owes to all such persons, as well as to the passenger, the duty of reasonable care to maintain the place in proper and safe condition, and it is liable to such person for any injury, which, without negligence on his part, befalls him by reason of its negligence, in this respect. It is liable for the acts of the employees of the railway company who give directions to the passenger, and those who so attend him, as to the location of the train which the passenger desires to take, and the course to reach it. A person attending the passenger, and obeying such direction, and, who is injured by the negligence of the depot company in respect to the condition of its premises, is entitled to an action against such company.—(28-30)

4. **Verdict—Immaterial Interrogatory Not Answered—**The failure of the jury to answer an immaterial question submitted to it, is no ground to withhold judgment upon the verdict.—(30)

5. **Damages — Elements — Loss of Time—**Among the elements of damage from a personal injury is the loss sustained by being kept from an established business, which the injured person has founded and personally conducted.—(30-32)

*Appeal from Denver District Court*—Hon. GREELEY W. WHITFORD, Judge.

Messrs. DORSEY & HODGES for appellant.

Mr. FRED W. PARKS and Mr. C. J. BLAKENEY for appellee.

Mr. JUSTICE MUSSER delivered the opinion of the court:

On a certain morning in September, 1905, Wolfe Londoner, accompanied his daughter from his residence to the Union Depot in Denver to aid her in getting aboard a train of the Denver & Rio Grande Railroad Company, as a passenger for Colorado Springs. Upon arriving at the depot, they walked through an open arched passageway, which ran through the depot building; thence through an open gateway, directly in line with the said passageway, into the yard, and they came upon a platform about fifty feet in width, made of brick and plank and built to the level of the rails, so as to afford a convenient walk for those coming from and going to trains. On either side of this walk, the various trains, about to depart, were standing and receiving passengers. After passing through the gateway, the first track reached was called track No. 1; then came a brick platform about sixteen feet wide, running for a considerable distance from the broad walk parallel to the tracks and designed for the use of those boarding trains standing on tracks No. 1 and No. 2. Then came track No. 2; then a passageway parallel to the tracks and about nine and one-third feet wide, between the right rail of track No. 2 and the left rail of track No. 3, looking to the southwest toward Sixteenth street; then track No. 3; then another brick walk about sixteen feet wide running parallel with the tracks and designed for the use of those boarding trains standing on tracks No. 3 and No. 4. The train that the daughter desired to board was standing on track No. 3. It was the occasion of a Grand Army Encampment in Denver, and a great crowd of people

were congregated on the wide walk going to their
various trains. Londoner and his daughter pro-
ceeded in the crowd to the train on track No. 3. The
testimony on behalf of Londoner shows that on the
broad walk, at the rear of the train, were two or
three men dressed like railroad men, who cried out
that that was the Rio Grande train for Colorado
Springs and Cripple Creek. The crowd seemed to
turn back from the sixteen-foot walk between tracks
No. 3 and No. 4, and these men indicated by their
gestures that the people should pass down the narrow
passageway between tracks No. 2 and No. 3. A large
number, among whom were Londoner and his daugh-
ter, turned down this passageway. The way was not
bricked, but was formed of charred coal or cinders
to the level of the tracks. In it, and about forty-three
feet from the broad platform, was a gas valve,
elliptical in shape, several inches long and several
inches wide, projecting above the walk about four
inches. Londoner stumbled over this, fell and
severely hurt his knee. He arose, went forward with
his daughter, until he came to an open door of a car.
He then assisted his daughter into the car. After
this, he went home. The fall had affected his knee
in such a way that it caused what one of the phy-
sicians who testified called water on the knee, and
gave as the technical name, acute synovitis. He suf-
fered pain, was bedfast for about two months and
was kept away from his business for about four
months, after which, by the aid of crutches for a time,
he gave some attention to business and more as the
knee improved. There was evidence that the knee
was not yet well at the time of the trial in May, 1907,
and that the weakness would continue. He expended
about $800.00 for physicians, surgeons, nurses and
other things necessary for treatment. He was en-
gaged in the grocery business and had been so en-

gaged in Denver for about forty years, giving the business his constant supervision and care. The jury returned a verdict of $2,000 in his favor, and, from a judgment entered on this verdict, the depot company appealed.

A special interrogatory was submitted to the jury, asking them whether there was a train standing upon track No. 2 at the time of the accident. The jury answered that they were unable to agree on that point. If there was a train there, then the space between the car on track No. 2 and the car on track No. 3 was about four feet. The appellant claims that it was but an agent for the several roads that made use of its depot, tracks and yard; and that, therefore, if any one is liable for the injury, it is the Denver & Rio Grande Railroad Company, in whose train the daughter intended to and did become a passenger. It is upon this claim of agency that most of the errors assigned by appellant are based.

The appellant was organized in 1899, under the laws of Colorado, for the purpose, among others, of becoming the successor to the Union Depot & Railroad Company, which constructed, owned, maintained and operated the Union Depot, yards and tracks. The appellant asserts that it took over and succeeded to all the property, rights and contracts of its predecessor; that among the things to which it succeeded was a contract between its predecessor and the railroad companies relative to the depot, yards and tracks, wherein such a relation was established between it and the several companies as to make the appellant the agent of the railroad companies and to relieve it of any duty to the public and of any liability in this case.

The appellant was organized for the further purpose of owning, maintaining and operating a Union Depot in Denver, and in the accomplishment

of this purpose it owned, used, maintained and operated, for profit, in its own name, the depot building, yards and tracks for the accommodation of the traveling public, the same as any depot, yards and tracks are maintained and operated for such use. It has been already determined in this state that the purpose for which the appellant was organized, and which had been accomplished by it, was for the accommodation of the traveling public.—*Union Depot & R. R. Co. v. Meekin,* 42 Colo. 89. It is the duty of railroad companies, as carriers of passengers, to provide proper stational accommodations and safeguards for persons who may come to stations in order to become passengers, or who may be discharged from incoming trains.—Hutchinson Carriers (3d ed.), sec. 928. This duty, relative to stational facilities, is a duty which the carrier owes to the traveling public as much as any other of its duties, and it is a part of the duties which it thus owes. If this stational duty is performed by some one other than the carrier itself, it must of necessity remain a duty to the traveling public, due from the one that undertakes to perform it. It is not intended to intimate that the carrier would be relieved of its duty because another undertakes to perform the same duty. The duty and liability of the carrier is not considered in this case. It was for the performance of this stational duty that the appellant was created, and it accomplished the purpose of its creation when it undertook and performed that duty in its own name, under its own direction, with its own buildings, tracks and other structures, in its own yards and on its own property. By its conduct, it professed and made ostentatious the fact that it was performing this duty. There is no doubt that, by private contract between the appellant and the railroad companies, the latter made use of the facilities

which the former afforded, and it may be that the contract established certain private relations between them, which would be considered in any controversy among themselves or their privies, but that private contract does not profess to, nor could it if it did, change the relation of the appellant to the public, a relation which arose out of the very object of its creation, and was assumed, professed and held out by it in the ostensible accomplishment of that object.  The appellant was the owner and occupant of this station, yard and tracks, and it is clear from the very nature of its business that it invited all those who might desire to take passage on any of the roads running from its station, to come upon its premises.  This invitation extended also to those who desired to accompany an intending passenger, to see him off or to aid him in getting aboard a train, and such persons came lawfully upon the premises by virtue of such invitation.—*D. & R. G. R. R. Co. v. Spencer*, 27 Colo. 313; *Dowd v. C. M. & St. P. R. Co.*, 84 Wis. 105; Elliott Railroads (2d ed.), sec. 1256.

There is a well-known rule of law that declares that any owner or occupant of land who induces or leads others to come upon his premises, is liable in damages to such persons, they using due care, for injuries occasioned by the unsafe condition of the land or its approaches, if the condition was known to the owner and not to them, and was negligently suffered to exist without timely notice to the public or those who are liable to act upon the invitation to come there.—*Lunt v. Post P. & P. Co.* (Colo.), 110 Pac. 203; *Bennett v. R. R. Co.*, 102 U. S. 577; *Carlton v. Franconia I. & S. Co.*, 99 Mass. 216.

In *Sweeney v. Old Colony Ry. Co.*, 10 Allen 368, speaking with reference to an owner or occupant of land, it is said:

"If he directly, or by implication, induces per-

sons to enter on and pass over his premises, he thereby assumes an obligation that they are in a safe condition suitable for such use, and for a breach of this obligation he is liable in damages to a person injured thereby.''

This rule is applied to the owner and occupant of railway stations, and the law imposes upon such an owner and occupant the duty to keep the station and facilities in a proper condition for the safety of those who go upon the premises in response to the invitation extended.—*T. W. & W. R. W. Co. v. Grush,* 67 Ill. 262; *McDonald v. C. & N. W. R. R. Co.,* 26 Ia. 124; *Patten v. C. & N. W. R. R. Co.,* 32 Wis. 524; *Atl. B. Ry. Co. v. Owens,* 123 Ga. 393; Hutchinson Carriers, sec. 928; *Dowd v. C., M. & St. P. R. Co., supra; Maxfield v. Ry. Co.,* 100 Me. 79; Elliott Railroads (2d ed.), secs. 1256, 1641.

Among other things which the appellant undertook to do in the operation of its station, was to direct passengers to their proper trains, as is shown by a rule which it had requiring depot officers and their assistants and train men, when on duty, to perform this service for it. The rule also shows the means or agency through which the appellant chose to perform that service. While the evidence is not clear that the employees who directed Londoner and the others to go down the passageway, wherein the accident happened, were trainmen and not depot officers or assistants, for the purpose of this case it may be assumed that these men were trainmen of the Denver & Rio Grande Railroad Company on duty. The appellant argues that it did not employ these men, could not direct them, nor discharge them; that they were not its agents, and that, therefore, it was not responsible for their direction of Londoner. These men were the agency through which the appellant chose to perform its service of directing pas-

sengers to their trains, and they were the only agency which it employed in this case to perform that service. It availed itself and had the benefit of the service of these men; made them the agents or means for the performance of that particular part of its work which it had undertaken in the operation of its station, and it cannot now be permitted to say that Londoner had no right, so far as it was concerned, to follow the directions of the agency which it adopted and used as the means through which it gave directions. This principle has already been settled in this state in *D. & R. G. R. R. Co. v. Gustafson*, 21 Colo. 393. It follows, therefore, that the court did not err in its instructions in coupling the trainmen with the depot officers of the appellant and their assistants. While in the Gustafson case, it was shown that there may be instances when it is a question whether a person is justified in acting solely on directions, as at a crossing where danger is obvious, yet the reasoning plainly shows that in cases like the present, where no danger is obvious, a person may rely on the directions. Here, even if it be assumed that a train stood on track No. 2, the situation, as revealed by the testimony of both sides, was not one of obvious or apparent danger. There is no evidence that there was any sign or warning that the passageway was at all dangerous, or that it was not to be used in the face of directions to use it. The plat and evidence on the part of appellant show the absence of those things, and do not reveal anything that would cause, in an ordinary man, standing amidst the crowd on the wide walk, the slightest apprehension of danger in going into the passageway when directed. The passengers knew that trains would not pull out until schedule time, and that was about fifteen minutes away. They might think that the passageway was

narrow or inconvenient, but there was nothing about the premises or in the circumstances to indicate that there was any danger in going into the passageway when directed to do so, or that in any way suggested that they should do other than obey the directions given. There was nothing for the jury to conclude but that a person of ordinary caution would unhesitatingly, and of right, follow the directions, and go down the passageway between the cars to board the train. Hence, it follows that it was immaterial whether a train stood upon track No. 2 or not, for Londoner had the right to and could not be expected to do anything else than follow the others into the passageway to board the train. That fact being immaterial under the circumstances, the court did not err in receiving the verdict, nothwithstanding the jury failed to answer the special interrogatory which covered the immaterial matter.—*Denver v. Teeter*, 31 Colo. 486.

In an instruction relating to damages and the elements thereof, the jury were told that they could take into consideration, among other things, the pecuniary loss, if any there was, by reason of the suspension of Londoner's personal oversight and attention to his business during the time he was confined to his home on account of his injuries; his loss, if any there was, by reason of any decreased ability to give his personal attention and oversight to his business from the time he was able to return to his work until the trial; and his loss, if any there was, by reason of any decreased ability to earn money in the future or to continue to give the same personal oversight and attention to his business as before the accident. These matters are objected to. The appellant does not say that they are not proper matters for consideration by a jury when supported by evidence, but asserts that they were not proper matters

for consideration in this case, because there was no evidence justifying their submission to the jury. It was alleged in the complaint that Londoner was confined to his bed and home for four months; that thereafter he was unable to properly attend to his business or perform his ordinary duties, and that, in the future, he will not be able to attend to or perform more than a part of his work. There was evidence sustaining these allegations, and there was therefore evidence that his time was lost by reason of the suspension of his personal oversight and attention to his business, and by his decreased ability to give his personal oversight and attention. Was there evidence of the value of this lost time? There was evidence showing the character of the business; that Londoner had built it up, and had always given it his personal attention and oversight; that he had been engaged therein for many years, and the particular duties and work performed by him were shown generally. There was also evidence showing that the services rendered by Londoner in his business were worth five or six hundred dollars a month. These were all matters for the jury to consider in fixing the value of his time. In *Masterson v. Village of Mt. Vernon,* 58 N. Y. 391, at 396 it is said:

"The plaintiff had the right to prove the business in which he was engaged, its extent and the particular part transacted by him, and if he could, the compensation usually paid to persons doing such business for others. These are circumstances the jury have a right to consider in fixing the value of his time."

There was no allegation of a loss of profits, nor any attempt to prove a loss of profits. That was not necessary. As is said in *Silsby v. Mich. Car Co.,* 95 Mich. 204, at 209:

"The loss of profits in conducting a business involving the labor of others is not a necessary consequence of personal injury to the plaintiff. The extent of his recovery upon this ground would be what his services were worth in the conduct of such a business as he was engaged in."

In *C., R. & I. R. R. v. Martin,* 41 Mich. 667, evidence of the nature and extent of plaintiff's business to show how far he was affected in it was held competent to show his pecuniary loss by reason of the suspension of his personal oversight and labor, and hence must have been considered as some evidence of his damage in that regard. The court said:

"We think it was competent to give such a full account of plaintiff's business as to show how far he was affected in it, and this could not be done without showing its nature and extent. There was no evidence received as a ground of damage beyond his pecuniary loss by reason of the suspension of his personal oversight and labor. There was no error in this regard."

Londoner had a definite status in a regular and established business, to which he devoted his whole time. He was not engaged in odd jobs or various schemes. The value of his time or services was thus capable of measurement, and had a value as shown by the uncontradicted evidence of a competent witness. Such evidence may be taken into consideration by the jury.—*Harmon v. Old Colony R. R.,* 168 Mass. 377; *Whipple v. Rich,* 180 Mass. 477.

It is thus seen that there was evidence to support these elements of damage embraced in the court's instruction. If more evidence could have been given, the company cannot complain of its omission, for it probably would have increased the verdict above the sum of $2,000.00. There were other elements that were considered in arriving at

that verdict, such as expenses for doctors and nurses, and damages for physical pain and suffering. In a general way, all of the seventy-six assignments of error have been answered upon the phases of the case embraced in the assignments; the question of the negligence of the company and contributory negligence of Londoner were submitted to the jury, and as no error has been discovered, the judgment is affirmed.                                      *Affirmed*.

CHIEF JUSTICE CAMPBELL and Mr. JUSTICE BAILEY concur.