STONEBREAKER v. BAMBERGER et al.

No. 5680.   Decided February 13, 1936.   (54 P. [2d] 418.)

*E. Le Roy Shields, A. H. Hougaard,* and *B. P. Leverich,* all of Salt Lake City, for appellant.

*Irvine, Skeen & Thurman,* of Salt Lake City, and *DeVine, Howell & Stine* and *A. W. Agee,* all of Ogden, for respondents.

WOLFE, Justice.

The court directed a verdict for the defendants, from which order plaintiff appealed. The plaintiff, in walking over the

cement station platform of respondents' depot in Ogden, Utah, in the course of boarding one of respondents' trains, slipped on grease apparently deposited by dropping from some motor vehicle. There is no dispute as to these facts. The grease was on that part of the platform where patrons of the respondents were entitled and perhaps required to walk from the corridor leading from the waiting room to the trains. The cement platform was for the accommodation and use of such patrons, and was also used, by permission of defendants, for the accommodation of cars and trucks calling for or delivering passengers or freight or packages to the station or adjacent express or freight offices. Both the respondents and the Utah-Idaho Central run busses from and to the station. There is some conflict in the evidence as to whether the busses of the respondents traversed that part of the platform where plaintiff slipped on the grease in their turnings to leave the station through the alleyway in which they entered.

The main question is as to whether the court erred in holding that there was no evidence of negligence on the part of the respondents. Respondents contend that the holding was correct because (1) plaintiff's allegation was that the grease was deposited by motorcars and busses used by respondents for the transportation of passengers and not otherwise and that there is no proof that such was the case; and (2) that, even though the amended complaint can be construed as to charge negligence in permitting grease to remain on the platform without regard to whether it was dropped by defendants' busses, no violation of duty by respondents is shown, because there is no proof of the length of time the grease was on the platform before appellant slipped, and hence nothing from which it can be inferred that respondents were negligent in failing to remove the grease within a reasonable time after it was deposited. We take these two questions in their order. The charging part of the first complaint, with parts omitted not essential to the question at hand, reads as follows:

"* * * That at said time said defendant carelessly and negligently *caused and permitted a quantity of oil or grease* to accumulate and *to be* upon a small area of said station grounds * * * and that said defendants * * * well knew or in the exercise of ordinary care should have known, that the grease and oil was left *or permitted to be upon said station grounds* at a place where passengers would be apt to slip and fall, but notwithstanding said fact said defendants carelessly and negligently *permitted* said oil and grease *to remain* upon said station grounds * * * and carelessly and negligently failed and omitted to remove the same." (Italics supplied.)

After this complaint had been demurred to specially and such demurrer sustained, the following was added:

"That said oil and grease had been upon the area aforesaid * * * for a period of many days, and *plaintiff is informed and believes and therefore alleges, that the same had been deposited* * * * *by the gasoline motor cars and buses of said defendant which were used for transportation of passengers as aforesaid."* (Italics supplied.)

Respondent contends that, in order to prove her case, appellant was required to prove that the grease was deposited by motorcars and busses operated by respondents and used for the transportation of passengers, and that there is no evidence of that. We agree that there is no evidence directly or which by inference establishes the fact that the particular grease plaintiff slipped on was deposited by a respondents' bus. That would be a mere speculation. As we shall later show, the jury in determining the time when the grease was deposited might find as one possibility that it could have been deposited by defendants' or the Utah-Idaho Central's bus by combining inferences from the testimony of several witnesses, but that is far from saying that there was evidence from which it could be inferred that the grease came from defendants' busses. But we do not believe such proof necessary in order to sustain a cause of action contained in the complaint. Negligence in respect to the deposit of grease on this platform under the circumstances of this case could be of three types or a combination of them. The respondents

could be charged with having deposited it there. That would not imply intentional depositing but permissive depositing by running its busses over a place where passengers were required to walk to board trains when they knew that such busses had the attribute of dropping grease. That would be negligence by feasance, although not exactly similar to the intentional affirmative act of putting the gravel on the platform, as in the case of *Barlow* v. *Salt Lake & Utah R. Co.*, 57 Utah 312, 194 P. 665. But in final analysis there may be but little difference between one permitting his vehicles which he knows deposit slippery substances to go where they deposit it, and intentionally deposited it, at least as far as the act of deposit is concerned, although as to the matter of actual knowledge of the deposit there is considerable difference. Second, permitting other motorcars than their own to deposit it in the sense of permitting vehicles which they know from experience have the propensity to to drop grease to go where passengers are required to walk. This is negligence by nonfeasance, i. e., in not prohibiting disposers of grease from using such platform. Third, charging negligence not in the depositing of grease but in failing to remove it after being deposited, again negligence by nonfeasance. When the special demurrer was interposed, the court held correctly, we believe, that it was difficult to know from the complaint whether the plaintiff meant to charge the first, second, or third type of alleged negligence. The charging part quoted above read: That defendant "caused and permitted" (the abstract uses the word "or" instead of "and") the grease "to accumulate and to be" on the platform. It was difficult to know whether in charging that defendant "caused" it "to be" on the platform plaintiff meant caused by defendants' own agency the grease to be deposited, or whether by the words "and permitted" it was meant to charge that the defendants allowed it to remain or "to be" on the platform. The word "caused" might imply the first type of negligence. The word "permitted" might imply the second or third type. Other parts of the para-

graph speak of the "defendant permitting said oil and grease to remain upon said station grounds", charging the third type. The whole was ambiguous in that regard. The amendment added the part we have specified above. This really did not remove the ambiguity, because it practically left the complaint as if it had said, "I charge the defendants with negligently permitting grease to remain on the platform and I am informed and believe that their buses deposited it there." This simply added something superfluous to the third type of negligence charged, in that it expressed a belief that the grease which *was permitted to remain on the platform* had been dropped from the defendants' busses. Failing to establish that belief would not work a failure to establish the gravamen of the charge, to wit, that defendants negligently permitted the grease to remain on the platform.

If defendants wanted to be sure as to what act of commission or noncommission the plaintiff would rely on as constituting the negligence, they should have demurred again to the amended complaint. The plaintiff could have based her theory on all or any of the three above-mentioned types of supposed negligence, but might have been required to separate them into counts because they really constitute different theories of negligence. However, in the final analysis, it is difficult to see where alleging that the defendants allowed their own busses to come over the platform where they might drop grease is an act different in nature or kind from a legal standpoint than allowing other busses or motor vehicles to traverse the platform where they might drop grease. If the negligence relied upon is the permitting of such instrumentalities to go on the platform as drop a substance which may cause slipping to persons rightfully and legally on the platform, then it makes no difference whether the defendants permitted their own or other such instrumentalities to do the depositing. If that is the negligence charged by the words "caused * * * a quantity of grease * * * to be upon * * * said station grounds," it matters not by whose instrumentalities the defendants caused it. If,

on the other hand, the negligence charged is that defendants permitted it to remain for an undue length of time, then adding that allegation that the defendants' busses dropped the grease adds nothing, because the negligence is the permitting it to remain and not the depositing of it. It is doubtful whether the plaintiff could even have aided in the matter of bringing home to the defendants knowledge of the fact that the grease was on the platform by proving that their own vehicles deposited it there. If knowledge, either actual or constructive, of the presence of grease is necessary under the facts of this case—a point we shall later consider—it may be that such knowledge is not gained any more by the fact that it dropped from defendants' vehicles than it dropped from some one else's motorcars. Under the theory that defendants must be shown to have had knowledge either actual or constructive of the presence of grease for such length of time as to make their failing to remove it negligence, it may be that such knowledge is not the more brought home to them by showing that their busses dropped it. However, it is not necessary for us to decide this point, but all we need say is that, if it is the case that proof to the effect that the grease came from the defendants' busses is proof or in aid of proof that they had knowledge of the presence of the grease on the platform, such fact is evidence to establish the scienter and need not be alleged. The allegation that defendants negligently failed to remove the grease, under such theory, is sufficient to admit any fact which would tend to prove the permitting of it to remain after they knew, or reasonably should have known, of its presence. And, if the fact that their busses dropped it assists or supplies the knowledge that they knew of its presence on the platform, such fact could be admitted without alleging it.

The real ambiguity in the charging part of the complaint was in the use of the words "caused to be on the platform" and the part which appears to charge the permitting of the grease to remain there as negligence. And this was not removed by the amendment. But it was quite apparent that

the parties tried the case on the theory that the negligence lay, not in permitting the grease to be deposited, but in permitting it to remain or to be on the platform. The court so understood, because it concluded that the situation required that it be proved that the defendants either knew it was there and failed to remove it within a reasonable time or that the grease was there for such a length of time that the jury might be permitted to say whether the defendants were not negligent in failing both to discover and then to remove it. And, because the court concluded that there was no proof of how long this grease had remained there and no proof that the defendants actually knew of its presence, there was nothing upon which to predicate negligence.

We doubt whether this is the kind of a situation where notice or knowledge of the presence of the particular substance which caused the accident need be proven. This is not the so-called "banana peel" case. That is the case where some person throws down a banana peel upon which another slips. That is an occasional and comparatively infrequent occurrence, and the railroad company, not being an insurer of its patrons' safety against all hazards, has only the duty to inspect the station at reasonable intervals for litter and remove it. A breach of that duty occurs when the banana peel lies so long that the company in failing to remove it can be said to have either been negligent in not seeing it or, having known of it, failed to remove it. And, where the banana peel is in such condition as shows in itself that it had lain for a considerable length of time, the doctrine of res ipsa loquitur may apply just as it might apply to grease if there was something about the grease which had shown that it must have been on the platform for a considerable length of time. *Anjou* v. *Boston Elevated R. Co.*, 208 Mass. 273, 94 N. E. 386, 21 Ann. Cas. 1143. In the recent case of *Jenson* v. *S. H. Kress & Co.*, 87 Utah 434, 49 P. (2d) 958, we held that the doctrine of res ipsa loquitur did not apply because there was nothing in the situation itself which would bespeak negligence on the part of the company

in regard to a broken showcase. The plaintiff herself in that case could have broken it, or some other patron very shortly before the accident. So it might be in the ordinary banana peel case. Any patron might have thrown it down only a moment before another slipped on it, so short a time before that the company could not possibly have removed it before the slipping. That is the reason why it must be shown that there was opportunity to remove it before negligence can be shown. But change the situation somewhat. Suppose that motorcars carrying banana peels or other slippery substances rather frequently traverse a platform which is also for the use of patrons and the one on which they are required to go to board trains, and these conveyances frequently and not only occasionally drop these substances and the company knows of it. Can it be said that under such circumstances it would be necessary to prove that every time a particular substance fell from the conveyance and some one slipped on it the company had knowledge of the presence of such substance on the platform or that it was there for such length of time as to make it incumbent on the company to take notice? We think not. See *Markman* v. *Bell Stores Co.,* 285 Pa. 378, 132 A. 178, 43 A. L. R. 862.

That is almost the exact situation in this case. There is no doubt but that the defendants permitted motor vehicles to go on the platform; that they knew that they did drop grease and that such grease was a hazard while on the platform. Defendants' own witnesses testified that they were instructed to clean up the grease and to make frequent indangerous to have it there. The defendants knew that the spections of the platform and that they knew that it was very vehicles which they permitted to go on the platform would drop grease. Their employees cleaned up the grease. They had control over the situation at least in the sense that it was by their management that the hazard makers were permitted to go on the platform. If the defendants had habitually permitted machines, one of whose attributes was to drop banana peels, to go over the platform, we would not

have the so-called banana peel case. This is the case not of some occasional or comparatively unusual or infrequent or unexpected happening, like a tree falling in a city or some defect occurring in the public parts of a town where the area is large and where it would take a large corps of persons always on the watch to notice all possible defects which might occur, and then perhaps to little avail, because the defects would occur at the unlooked for places or in an unlooked for manner. This is the case of a rather small area over which trucks and other vehicles known to drop grease frequently are permitted to travel. This is the old case of determining whether, under all the circumstances, the defendants used due care to keep premises in a safe condition, and this was for the jury. True, the test was ordinary care, but ordinary care under some circumstances may, paradoxically as it may seem, be extraordinary care. While ordinary care is the test, the content of ordinary care is dictated by the circumstances. Some circumstances might require very little inspection or watchfulness or circumspection, as the case may be, in order to satisfy that degree of care; others might require great diligence and watchfulness or, in comparison to the first situation, great and extraordinary care. Theoretically the measure or degree remains the same, but the content changes depending on the circumstances. Thus does a gallon measure remain the same, but what its content may be depends upon what is put in or required to be put in. The analogy is not strictly apt, because ordinary care seems to be an expanding measure which will enlarge to take in the content necessary. Jurisprudence has found these elastic terms unsatisfactory, but can find ones no more exact to cover the great variety of cases. Generalization compels the use of elastic terms. What, in reality, it sifts down to with an intelligent and unprejudiced jury is that the jurymen determine whether under all the circumstances the person on whom the duty devolves has acted reasonably, which is itself an elastic term. And, in determining whether the person has acted reasonably, the jury

inquires whether he has done, under all the circumstances, what could be fairly expected of him, supposing him to be an average person, and their conception of the average person is derived from their belief that they themselves are average persons. Whatever elegant and high-sounding language with which we may dress these principles, practically it comes down to the fair juryman placing on the defendant the standard which he believes he would apply to himself under those circumstances. Or perhaps in the final analysis the jurymen simply determine whether under all the circumstances it would be fair that defendant pay plaintiff something.

In this case there was no question but that the plaintiff slipped on grease deposited on defendants' station platform. Did the defendants use that care required of them to keep the place free from grease? The witness Farley testified that he made from 14 to 16 inspections a day. On this Sunday he did not come until after the plaintiff slipped. Then he cleaned up that grease. Thomas, freight cashier and on this Sunday ticket clerk, inspected the platform to and from his trips to take weather reports, to wit, 10 a. m., 12 noon, and 3 and 5 p. m. Buck, who gave the orders to Thomas and Farley, inspected the platform this Sunday morning about 9:15 and again at 10:45. If his office work engaged his attention until 2 p. m., it would be that hour when he made his next inspection. Other employees were instructed to inspect the platform when they had occasion to go upon it. The defendants evidently recognized that there was apt to be grease quite frequently upon the platform and its hazard to passengers. While the theory on which the case was tried was alleged negligence in permitting grease to remain and not permitting it to be deposited, yet the fact that the defendants permitted instrumentalities to go on the platform, knowing that grease was frequently dropped by them, may, in order that they perform their duty of exercising ordinary care, require that they also notice and remove the grease as soon as the vehicle

which deposits it leaves the place where it was when the grease was deposited, or at least very shortly thereafter. The jury may determine that nothing less would be such ordinary care as the circumstances dictated. Certainly, proper regard for their patrons who are required to traverse that platform would seem to require them to use every precaution to discover and remove the grease which was deposited there by their permitting vehicles to travel on and across that platform. They are not insurers. But they may be held responsible for very high precautions under these circumstances. It is for the jury to determine whether they took those precautions which would be "ordinary care" under these circumstances. If they did not—if there was not frequent enough, or perhaps not almost constant, inspection, if that were demanded—the jury could find under the evidence that their duty in that regard had not been performed.

Where the jury may find that grease was frequently dropped on the platform with defendants' knowledge of the fact, it does not strike us as being very different from the case where ice and slush were left on the platform which the railroad company was required to take notice of, and where failure to remove it was put to the jury to determine whether it constituted ordinary care under the circumstances. *Maxfield* v. *Maine Cent. R. Co.*, 100 Me. 79, 60 A. 710; *Rodick* v. *Maine Cent. R. Co.*, 109 Me. 530, 85 A. 41; *Ainley* v. *Manhattan R. Co.*, 47 Hun (N. Y.) 206, 9 Am. Neg. Cas. 599; *Weston* v. *New York El. R. Co.*, 73 N. Y. 595; *Hull* v. *Minneapolis, St. P. & S. S. M. R. Co.*, 116 Minn. 349, 133 N. W. 852. Whether nature creates ice and snow on a platform which may remain while the temperature is low enough until removed or whether motorcars deposit splotches of grease on the platform which may remain until removed makes but little difference. When the company knows of the likelihood of the frequent dropping of grease, it is just as much notice as it knows of the presence of ice and snow. It does not have to be put on notice of each individual de-

posit. It has notice of the general condition which prevails. That is sufficient.

Some of the above cases lay it down as a positive duty of the railroad to keep the parts of the station, such as platforms and stairways, free from ice and snow, or at least make them so that patrons will not slip, when the weather conditions are such as to put them on notice that there is a likelihood of the presence of such substances on the parts used by patrons. See, also, *MacLaren* v. *Boston El. Ry. Co.*, 197 Mass. 490, 83 N. E. 1088; *Lemon* v. *Grand Rapids & I. R. Co.*, 136 Mich. 647, 100 N. W. 22. Especially is this true where ice and snow are allowed to accumulate by other than natural causes or under such circumstances as would make the ordinary property owner liable to a pedestrian. *Waterbury* v. *Chicago, M. & St. P. R. Co.*, 104 Iowa, 32, 73 N. W. 341. If there is any difference in principle between the case where a railroad company permits snow and ice to accumulate or to be on part of its property where passengers are entitled or required to go without removing or putting on ashes, sawdust, or some other rough substance, and a case where vehicles are permitted to travel over such parts of the premises knowing that they will drop grease, it may be in favor of the snow and ice cases, because one cannot stop the action of nature, while one may control or prohibit the passage of vehicles. But, while there may be cases in which the evidence is such that the court could say as a matter of law that the defendant was negligent, the general rule of obligation to use ordinary care applies. In this case, if it appeared that the grease was actually allowed to accumulate and remain without precautions to remove it, the court might say as a matter of law the defendants were guilty of negligence. But, where there is evidence of inspection and removal of grease from time to time, it is for the jury to say whether what the defendants did in that regard met the standard of ordinary care, taking into consideration all of the circumstances. And the jury could equally as well find

that the natural and probable result of the omission, if any, to use that precaution, which the circumstances dictated, resulted in the accident, for it could find that, if such precaution had been taken, the grease would not have been there when the plaintiff stepped on that spot where it was.

In fact, even under the theory that the plaintiff must prove the scienter, or what is its equivalent, a reasonable opportunity to have discovered the grease, in order to recover, we believe sufficient is in evidence to entitle the jury to pass on the question. Buck said there was no grease there at 9:15. Martin, who drove the motor tram in which plaintiff rode after she slipped, fixed the time when she boarded the tram after her accident as about 10:05. Farley, who was not on duty, but who was on the platform shortly after the accident, cleaned up the grease on which Mrs. Stonebreaker slipped shortly after 10 a. m. Thomas said as nearly as he remembered it was 9:50 a. m. that he inspected the platform and found no grease, but his inspection was on his way out to check the freight yard and weather report, and that about ten minutes later upon his return from such trip he again inspected it. But this was incidental and by way of routine done every day. Martin testified that, while he was back and forth over the platform, he saw no cars for a period of three hours except the Bamberger bus, which came in at 9:40, and the Utah-Idaho bus, which left at 9:45. Under all the evidence, it was for the jury to determine how Martin's testimony fitted into that of Buck and Thomas and Farley. If there were only two busses which came in within three hours before 10 o'clock a. m., then either one of those busses went over that spot where the grease was and deposited it after Thomas went by or before he went by and he did not see it, or the grease was there long before the busses came and Thomas failed to see it, or Martin was mistaken and other cars had come in before or after Thomas looked, and either it was not there or Thomas failed to see it, depending on whether it was deposited by such other cars, if there were other cars, before

or after he went by. It was for the jury to determine which situation was the most probable, and accordingly, as it determined what that situation was, it might have found that the grease was there for such length of time as would require the defendants to exercise ordinary care to take notice and remove it. Certainly, where vehicles dropping grease are allowed to travel over a platform where passengers are compelled to walk to and from trains and busses, the jury would not need to determine that the grease was deposited for a very long time in order to charge defendants with the scienter, assuming that defendants' theory adopted by the court that scienter was necessary is sound.

In a case such as this one where the defendants know that splotches of grease are being deposited from time to time with fair frequency by vehicles which travel over the platform with their permission, it would appear to make but little difference whether we adopt the theory that they are entitled to no opportunity to take notice of each individual dropping because they are bound to take notice in view of the general condition, and that it is simply a matter for the jury whether they exercised that care commensurate with the exigencies or whether we adopt the theory that the defendants were entitled to opportunity to discover each individual deposit of grease, but that, in view of the conditions under which it was deposited, it was for the jury to say whether in this case the very shortest time the grease may have been on the platform was sufficient to apprise the defendants of its presence. The jury may find that under the conditions which pertained it should be discovered almost if not immediately upon its being deposited. If that is the case, the two theories come to the same end. Personally we think the first theory is more consonant with the situation. The defendants were bound to take notice, for, if they were not negligent in permitting grease to be deposited, at all events when it was deposited the precautions which they must exercise to discover and remove it were for the jury.

The judgment of the lower court is reversed, with costs to appellant.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.